TRANSONIC SYSTEMS, INC., a New York Corporation, Plaintiffs,

v.

NON–INVASIVE MEDICAL TECHNOLOGIES CORPORATION, d/b/a In–Line Diagnostics Corporation, Defendants.

No. 1:99CV00041B.

United States District Court, D. Utah, Central Division.

Oct. 7, 2000.

Andrew H Stone, Ryan M. Harris, Jones Waldo Holbrook & McDonough, Salt Lake City, UT, James F. Lesniak, Michael K. Friedland, Knobbe Martens Olson and Bear LLP, Newport Beach, CA, Thompson E Fehr, Ogden, UT, Karen Vogel Weil, Los Angeles, CA, Brian B. Shaw, Harter Secrest & Emery LLP, Rochester, NY, for Transonic Systems, a New York corporation, plaintiff.

Terry E. Welch, Parr Waddoups Brown Gee & Loveless, Salt Lake City, UT, Michelle Greer Galloway, Jennifer L. Wong, Jonathan H. Takei, Ricardo Rodriguez, Cooley Godward, Palo Alto, CA, Stephen P. Swinton, Amy S. Hellenkamp, Cooley Godward, San Diego, CA, for Non–Invasive Medical Technologies, a Delaware corporation dba In–Line Diagnostics Corporation consolidated plaintiff.

## MEMORANDUM OPINION AND ORDER

BENSON, District Judge.

### I.  INTRODUCTION

Before the Court are (1) plaintiff Transonic's motion for preliminary injunction against defendant NMT for infringement

of plaintiff's U.S.Patent No. 5,685,989 (the " 989 patent"), (2) NMT's motion for preliminary injunction against Transonic for infringement of U.S.Patent No. 5,312,550 (the " 550 patent"), and (3) NMT's motion for summary judgement against Transonic for infringement of NMT's 550 patent. Having reviewed the arguments, briefs, and relevant case law, the Court now issues the following Opinion and Order.

## II. BACKGROUND

### A. Subject Matter of the 989 Patent and the 550 Patent

The patents at issue claim methods related to kidney dialysis. A patient undergoing kidney dialysis will have a tube, or "shunt," inserted between a vein and an artery in the patient's circulatory system. The shunt is used to facilitate the connection of a dialysis monitor, or "dialyzer," to the patient's circulatory system. A dialysis patient will have a tube inserted in the upstream arterial end of the shunt to extract the patient's blood and deliver it to the dialyzer. Another tube is inserted in the downstream venous end of the shunt to return the treated blood from the dialyzer to the patient.

Over time, the rate of blood flow through the shunt decreases due to clogging of the shunt. As a direct result of the clogging, the treated blood returning to the patient may be drawn back up the shunt and extracted through the arterial tube to be treated again. This process, called recirculation, is very undesirable and prevents much of the patient's blood from being treated by the dialyzer.

The 550 patent claims a process that detects when recirculation actually occurs in a dialysis patient. The process claimed by the 550 patent is comprised of two steps. The first step requires the injection of a "material ... having a physical property differing from that of blood," such as saline, into the treated blood before it is returned to the downstream venous end of the shunt. The second step involves monitoring the blood upstream from the venous tube to detect the "presence of said differing physical property, [and] thereby detect undesired recirculation of freshly dialyzed blood." U.S.Patent No. 5,312,550 at col. 2, line 55, through col. 3, line 3.

The 989 patent differs from the 550 patent in that it claims a process that detects the potential for recirculation long before clogging of the shunt causes actual recirculation. The 989 patent specifically claims a process for measuring the blood flow rate through a patient's shunt in order to determine the health of the shunt and prevent recirculation from occurring at an early stage. According to the 989 patent, the dialyzer lines are reversed such that the needle used to extract the patient's blood is placed downstream at the venous end of the shunt. The needle used to return blood to the patient is inserted upstream in the arterial end of the shunt. The blood is extracted through the downstream venous line and passed through the dialyzer. A "selected blood parameter" is changed while flowing through the dialyzer to "produce a distinguishable characteristic in blood" delivered back to the patient's shunt. The changed blood is returned to the shunt through the upstream arterial line and, consequently, mixes with the blood already flowing through the shunt. The amount of changed blood is measured as the mixed blood flows through the shunt and is again removed through the downstream line. The flow rate through the shunt is then calculated using the "measured amount of distinguishable blood characteristic." U.S.Patent No. 5,685,989 at col. 8, lines 34–55.

### B. Facts

Transonic developed a dialysis monitor, the HD01, that performs the process of the 989 patent. Transonic received FDA approval of the monitor and introduced its monitor to the market in 1995. Since then, the HD01 monitor sales have increased each year.

In 1998, NMT also began marketing a dialysis monitor, the CLM III monitor, that is capable of measuring shunt blood flow in dialysis patients through the use of NMT's Delta H method. Even though NMT claims that its customers do not place much emphasis on the Delta H feature in its monitors, NMT promotes the CLM III monitor to be used in accordance with this Delta H method. In March of 1999, Transonic filed this infringement action claiming that NMT's Delta H method infringes the method of the 989 patent. Originally, users of the CLM III monitor could only calculate shunt flow through manual calculations of data obtained through implementing the Delta H method. Toward the end of 1999, NMT installed software in its CLM III monitors allowing the rate of blood flow through a shunt to be calculated automatically. This software significantly increased the market appeal of the CLM III monitor. As a result, Transonic filed a motion for a preliminary injunction on April 26, 2000 requesting that NMT be enjoined from installing its new software on its CLM III monitors. Transonic does not ask that NMT be enjoined from selling its dialysis monitors completely.

As noted, the other patent at issue in this case is NMT's '550 patent. Between 1995 and 1998, the original owners of the '550 patent repeatedly offered to license the '550 patent to Transonic. Transonic refused the offers and provided the '550 patent owners with prior art that Transonic believed invalidated the '550 patent. After receiving Transonic's invalidity arguments, the '550 patent owners did not contact Transonic again regarding a license or infringement of the '550 patent. The '550 patent owners also offered NMT a license to the '550 patent. Likewise, NMT responded with prior art references that it believed invalidated the '550 patent. Transonic relies upon one such reference to show the invalidity of the '550 patent in this case. Notwithstanding NMT's previous negative response to the '550 patent owners, NMT purchased a three year license to the '550 patent on April 4, 2000. Shortly thereafter, on April 18, 2000, NMT brought this infringement action against Transonic claiming that use of Transonic's HD01 monitor infringes the '550 patent.

## III. DISCUSSION

As a result of the facts discussed above, there are three motions pending before the court: (1) Transonic's motion for preliminary injunction against NMT for infringement of Transonic's '989 patent, (2) NMT's motion for preliminary injunction against Transonic for infringement of NMT's '550 patent, and (3) NMT's motion for summary judgement against Transonic for infringement of NMT's '550 patent.

### A. Transonic's Preliminary Injunction

■ Under Federal Circuit law, a "preliminary injunction requires the assessment of four factors: the likelihood of movant's success on the merits, the irreparability of harm to the movant without an injunction, the balance of hardships between the parties, and the demand of the public interest." *Mentor Graphics Corp. v. Quickturn Design Sys.*, 150 F.3d 1374, 1377 (Fed.Cir.1998). The moving party, Transonic, has the burden of proving each of these elements listed above in light of the burdens of proof that will exist at trial. *See Reebok Int'l. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir.1994).

### 1. Likelihood of Success on the Merits

■ Transonic argues that NMT's Delta H method directly infringes the method of the '989 patent. Direct infringement occurs when the accused process includes each element listed in any single patent claim. *Seal–Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed.Cir. 1999). Transonic compares the elemental steps of claim 1 in the '989 patent to the Delta H method as described in NMT's

instruction manuals. Claim 1 reads as follows:

A process for determining in an arterio-venous shunt blood flow in a cardiovascular circuit, comprising:

delivering blood from a circulating system outside the cardiovascular circuit into an upstream location in an arterio-venous shunt connected in the cardiovascular circuit and carrying a shunt blood flow;

mixing said delivered blood with said shunt blood flow;

removing a portion of the mixed blood from said arterio-venous shunt at a location in the shunt which is downstream from said upstream location and delivering the removed portion of mixed blood to the circulating system;

measuring the amount of distinguishable blood characteristic in said removed portion of mixed blood; and

changing a selected blood parameter in blood flowing in said circulating system to produce a distinguishable blood characteristic in blood which is delivered to the arterio-venous shut from said measured amount of distinguishable blood characteristic.

(U.S. Patent No. 5,685,989 at col. 8, lines 34–55.) Central to this dispute are the "mixing" and "blood parameter" elements of the claim. In a "Markman" hearing held on November 17, 1999, the Court construed the term "mixing" to mean "the combining or putting together of two or more substances or things so that the constituents of each are diffused among those of the others." The Court also construed the terms "blood parameter" and "distinguishable blood characteristic" to mean a "measurable physical characteristic of the blood." *See Markman Hearing,* 1:99–CV–41, p. 4–7.

According to NMT's instruction manual given to users of NMT's monitors, the Delta H method requires the user to reverse the dialyzer line configuration such that the input line is upstream in the shunt and the out-take line is downstream. The blood is taken from the patient and the percentage of red blood cells, or the level of hematocrit, is changed. The changed blood is returned to the shunt upstream and again removed downstream where the hematocrit level is measured to determine the flow rate through the shunt.

■ NMT argues that the Delta H method does not infringe the '989 patent because the level of hematocrit is not a "measurable physical characteristic of blood.." NMT asserts that when the blood is returned upstream in the shunt in the Delta H method, it does not necessarily mix with the blood already flowing in the shunt. The Court finds these arguments to be directly inapposite to the definitions given to the terms "mixing" and "blood parameter" in the Markman ruling. Returning blood to the shunt will result in its mixing with the blood already flowing through the shunt much like the way water in two merging rivers naturally mixes together. That is exactly the type of mixing this Court sought to adopt as the definition of the term "mixing." Furthermore, the percentage of red blood cells in the blood is clearly a physical characteristic of blood. It is impossible to logically conclude that changing the hematocrit level in the blood, returning the changed blood to the flow of the shunt, and measuring the downstream mixed blood hematocrit level is different from what is claimed in the mixing, changing, and measuring elements of claim 1 of the '989 patent. Accordingly, the Court finds that Transonic has made a strong showing of likelihood of success at trial on the issue of infringement.

■ Transonic must also show that it is likely to succeed at trial on the issue of validity, recognizing that at trial, NMT will bear the burden of proving invalidity by clear and convincing evidence. *Genentech Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1364 (Fed.Cir.1997). Transonic rightly argues that the '989 patent is entitled to a presumption of validity. *See* 35 U.S.C. § 282. Additionally, Transonic correctly

argues that, because the prior art references used by NMT are the same or merely cumulative of those already examined by the examiner in the Patent Office, NMT's burden is "especially difficult." *Al–Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed.Cir.1999). "Ultimately, at trial on the merits, [plaintiff] need only submit sufficient evidence to rebut any proof of invalidity offered by [defendant]. Thus, where the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Canon Computer Systems v. Nu–Kote Intern.*, 134 F.3d 1085, 1088 (Fed.Cir.1998).

■ NMT focuses its case of invalidity on the fact that Dr. Krivitski, who is affiliated with Transonic, attended a seminar given by Dr. Hestor in 1993 and later reduced the invention to practice in less than a day. NMT claims this shows the invention was obvious. However, according to the patent act, "patentability shall not be negatived by the manner in which the invention was made" and "it is immaterial whether it resulted from long toil and experimentation or from a flash of genius." *In re Merck & Co., Inc.*, 800 F.2d 1091, 1100 (Fed.Cir.1986).

Dr. Krivitski's use of reversed lines was to determine the health of the shunt. Dr. Hestor reversed the lines merely to test his method of detecting recirculation. Dr. Hestor did not intend to reverse the lines in order to produce some clinically beneficial data, nor did he teach anything to suggest that reversing dialyzer lines could be used in such a clinically diagnostic manner. Because recirculation is an undesirable event in actual dialysis, it would have been counterintuitive to induce recirculation by reversing lines in order to determine a patient's health.

Additionally, the '989 patent is entitled to a strong presumption of validity that can only be overcome by clear and convincing evidence. *See Al–Site Corp. v. VSI Int'l.*, 174 F.3d 1308, 1323 (Fed.Cir.1999). The examiner of the '989 patent clearly

believed that Dr. Hestor's teachings do not render the patent obvious because the patent claims were allowed after comparison with Dr. Hestor's article describing the use of reversed lines. NMT presents two articles by Dr. Hestor in this action. However, the one article not cited in the '989 patent prosecution history is merely a summary of the first and adds nothing new to the teachings in the original Hestor article examined by the Patent Office. The "presumption of validity . . . carries with it a presumption that the Examiner did his duty and knew what claims he was allowing." *Al–Site Corp.*, 174 F.3d at 1323 (quoting *Intervet Am., Inc. v. Kee–Vet Labs.*, 887 F.2d 1050, 1054 (Fed.Cir. 1989)). Thus, the defendant's "burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Id.* (quoting *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed.Cir.1990)).

For the reasons stated above, the '989 patent is entitled to a presumption of validity that NMT is not likely to rebut at trial. Thus, Transonic has shown that it has a strong likelihood of success on the merits at trial on the issues of both infringement and validity.

### 2. Irreparable Harm

■ When the owner of a patent makes a "strong showing" of success at trial on the issues of infringement and validity, irreparable harm will be presumed. *See Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed.Cir.1996). As noted above, Transonic has made such a strong showing and is therefore entitled to the presumption of irreparable harm. However, even if irreparable harm is not presumed, Transonic offers persuasive evidence of irreparable harm. For example, NMT is Transonic's only competitor in the market of dialysis monitors that measure shunt blood flow. Also, because of increasing operating losses of NMT, it is questionable whether NMT will be able to satisfy an award of damages at trial. NMT claims

that it will be able to satisfy an award of damages. However, "because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Polymer*, 103 F.3d at 976 (quoting *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1456–57 (Fed.Cir. 1988)).

█ NMT argues that Transonic has not shown evidence of a single lost sale to NMT. While this may be true, such a showing is not necessary to demonstrate irreparable harm.

> Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's ... exclusive position by an award of damages and a permanent injunction. Customers may have established relationships with infringers. The market is rarely the same when a market of multiple sellers is suddenly converted to one with a single seller by legal fiat. Requiring purchasers to pay higher prices after years of paying lower prices to infringers is not a reliable business option.

*Polymer*, 103 F.3d at 975–76.

Transonic persuasively argues that, because of the exclusive competitive relationship between the two companies, every sale by NMT is a lost sale by Transonic. In contrast, NMT argues that because the CLM III monitors perform various functions aside from the measurement of shunt flow, the shunt flow feature is not the motivating feature for their customers and that customers purchase the monitors for a variety of reasons. Taking NMT's arguments as true, only sales to customers who are primarily motivated by the shunt flow measurement feature would constitute a lost sale to Transonic. Thus, in order to calculate damages, it is necessary to know what motivated each customer when purchasing a monitor from NMT. This makes damages calculations nearly impossible. Because of NMT's potential inability to pay a damages award, NMT's competitive relationship with Transonic, the difficulty in calculating damages, and the presumption given to Transonic, the Court finds Transonic has met its burden with respect to irreparable harm.

### 3. Balance of Hardship

The balance of hardship in this case clearly weighs in favor of Transonic because of the limited injunction it is seeking. Transonic is only seeking to preliminarily enjoin NMT from selling its monitors with the new software that automates the Delta H calculations. NMT will still be able to sell its monitors absent the software installation. NMT has stated that its customers are not primarily motivated by the Delta H feature. Thus, NMT will not likely suffer unreasonably from this type of injunction.

### 4. Public Interest

The Court finds no compelling public interest arguments on either side. Accordingly, the Court finds that Transonic has met its burden in demonstrating the need for a preliminary injunction. Transonic's motion to preliminarily enjoin NMT from incorporating its Delta H software into its dialysis monitors is granted.

### B. NMT's Preliminary Injunction

█ The likelihood of success on the merits and the showing of irreparable harm are the central points of the movant's burden. *See Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.*, 74 F.3d 1216, 1220 (Fed.Cir.1996). Accordingly, because NMT relies solely on the presumption of validity given to the '550 patent, NMT must show that Transonic is not likely to rebut this presumption at trial. NMT has not met this burden for several reasons.

First, Transonic provides three articles published nearly nine years before the '550 patent application that describe the method claimed in the '550 patent. These prior art references were not cited by the exam-

iner in either the original examination or the re-examination proceedings of the '550 patent. Transonic argues that the simple two-step process described in the '550 patent is also described in all three prior art references it presents. For example, an article entitled *The Assessment of Arteriovenous Fistulae from Pressure and Recirculation Studies* describes connecting a patient to a dialyzer and then, in order to detect recirculation, injecting saline solution into the venous line and monitoring the arterial line for the presence of saline. NMT has presented no convincing evidence that counters Transonic's showing of invalidity. In fact, NMT cited this same article to explain the '550 patent's invalidity in a letter to the original owners of the '550 patent just over two years ago.

Second, the original owners of the '550 patent contacted both NMT and Transonic offering licenses or threatening infringement. Both NMT and Transonic responded with prior art they believed rendered the '550 patent invalid. Three years have followed Transonic's response and the '550 patent owners have not contacted Transonic since that time.

NMT has also failed to convince the Court that it will be irreparably harmed in the absence of an injunction. NMT is not entitled to a presumption of irreparable harm because it has not made a strong showing of success with regard to validity. NMT believed the '550 patent to be invalid until just a few months ago. Because of NMT's failure to show a likelihood of success on the merits or irreparable harm, the Court denies NMT's motion for preliminary injunction.

## C. NMT's Motion for Summary Judgment

NMT seeks summary judgment that Transonic is infringing the '550 patent without regard to the patent's validity. However, as noted above, Transonic has brought forth evidence that, at the very least, raises a substantial question of fact regarding the validity of the '550 patent.

A judgment that an activity infringes an invalid patent is illogical and goes against all common sense.

Transonic also offers convincing evidence that it is merely practicing a method described in the prior art. A patent cannot exclude the public from practicing an invention disclosed in the prior art. *See Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1346 (Fed.Cir.1999). The law is clear that a party cannot infringe a patent by practicing that which is described in the prior art. *See Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1208 (Fed.Cir.1992).

In light of the questions of fact raised by Transonic's evidence of the prior art, NMT's motion for summary judgement of infringement is denied.

## IV. CONCLUSION

For the reasons stated above, the Court hereby GRANTS plaintiff Transonic's Motion for Preliminary Injunction, DENIES defendant Non–Invasive's Motion for Preliminary Injunction, and DENIES defendant Non–Invasive's Motion for Summary Judgement of Infringement.